**John Mark LATENDER, Petitioner-Appellant,**

v.

**Thomas ISRAEL, Warden, Respondent-Appellee.**

No. 77–2229.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1978.

Decided Sept. 19, 1978.

Rehearing and Rehearing In Banc Denied Nov. 14, 1978.

Milton D. Rosenberg, University of Wisconsin, Law School, Madison, Wis., for petitioner-appellant.

John D. Niemisto, Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before PELL and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

In this habeas corpus action petitioner, an enrolled member of the Menominee Indian Tribe now serving a term in a Wisconsin prison for burglary and murder committed on the Menominee Reservation, contends that Wisconsin had no jurisdiction to try and punish him. The District Court denied the writ, and we affirm.

Effective March, 1, 1976, after the events in issue here, Wisconsin retroceded its criminal jurisdiction over the Menominee Reservation to the United States pursuant to 25 U.S.C. § 1323. *State ex rel. Pyatskowit v. Montour,* 72 Wis.2d 277, 240 N.W.2d 186, 187–188 (1976). We are here concerned with the period after December 22, 1973,

the effective date of the Menominee Restoration Act, discussed below, and before the retrocession, the offenses for which petitioner was convicted having been committed during that period.

The courts and federal authorities that have addressed the question of Wisconsin's criminal jurisdiction over the Menominees during that period have concluded that jurisdiction existed. The Supreme Court of Wisconsin so decided in *State ex rel. Pyatskowit v. Montour, supra,*[1] and so did the same District Court from which this appeal is taken, in *Application of Nacotee,* 389 F.Supp. 784 (E.D.Wis.1975), *remanded,* 525 F.2d 694 (7th Cir. 1975) (with directions to vacate as moot because the petitioner had been tried and acquitted of the offense by the state court). In the case at bar the District Court relied upon *Nacotee* in denying the writ. In the *Pyatskowit* case, the court stated that the position of both the United States Bureau of Indian Affairs and the United States Department of Justice was that state criminal jurisdiction survived the effective date of the Restoration Act, although their theories of why this was so differed.[2]

18 U.S.C. § 1162 provides that Wisconsin shall have "jurisdiction over offenses committed by or against Indians in . . . [a]ll Indian country within the state," and that 18 U.S.C. §§ 1152 and 1153, which extend federal criminal law to major crimes by Indians in Indian country, are inapplicable in Wisconsin.[3] The language of § 1162

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The parties in the case at bar agree that exhaustion of state remedies would be futile in view of the *Pyatskowit* case.

2. The theory of the Bureau of Indian Affairs was that 18 U.S.C. § 1162, *see* text, *infra,* was repealed by implication as to the Menominees but the clear intent of the Restoration Act, citing 25 U.S.C.A. § 903d(d) (1978 Supp.), was that there be an orderly transition of authority and that therefore the transfer occurred on the date of retrocession. 72 Wis.2d at 280–281, 240 N.W.2d at 187–188. The Attorney General of Wisconsin took the same view. *Id.* The

theory of the Department of Justice was that 18 U.S.C. § 1162 continued to apply to the Menominees until retrocession. 72 Wis.2d at 281, 240 N.W.2d at 188. The Wisconsin Supreme Court agreed with that position, as do we.

3. Section 1162 provides in pertinent part as follows:

(a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory

is unambiguous and leaves no room for cavil. At the time relevant here it applied to crimes committed by a Menominee Indian on the Menominee Reservation unless it had been repealed by implication with respect to such crimes.

Petitioner argues that state jurisdiction was terminated by the Menominee Restoration Act of 1973, 87 Stat. 770, 25 U.S.C. §§ 903–903f. In order to understand this argument it is necessary to examine the legislation affecting the Menominees beginning in 1953. In August of that year Congress adopted Public Law 83–280, 67 Stat. 588, which, as amended, became present 18 U.S.C. § 1162. Public Law 280 gave certain states, including, as we have said, Wisconsin, jurisdiction over crimes committed by or against Indians in Indian country within the state, with specified exceptions in some of the named states. As originally adopted, the statute excepted the Menominee Reservation from the grant of jurisdiction to Wisconsin. The Menominee exception is explained in the legislative history as based on a statement by the tribe "that its tribal police organization was capable of maintaining order on the reservation and that its people are not yet ready to be subjected to State laws." Letter from the Assistant Secretary of the Interior to the Chairman of the House Committee on Interior and Insular Affairs, quoted in Sen.Rep.No.699, 83rd Cong., 1st Sess. 7. Exceptions for other Indian tribes in several other states were similarly explained.

On June 17, 1954, Congress adopted the Menominee Termination Act, 68 Stat. 250, former 25 U.S.C. §§ 891–902. The purpose of that Act was "to provide for orderly termination of Federal supervision over the property and members of the Menominee Indian Tribe of Wisconsin." Former 25 U.S.C. § 891. The Act provided for transfer of the Menominees' assets, then held in federal trust, to a newly formed corporation to be controlled by the Menominees. Former 25 U.S.C. §§ 893, 896, 897, 899. Section 10 of the Act provided that, once title to the property passed from the federal government to the tribal corporation,

> all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

Former 25 U.S.C. § 899. Transfer of the Menominee property to the tribal corporation was not effected until April 30, 1961, and therefore the provision just quoted, making Menominees subject to state law, had not become effective by the time of the passage of the next statute affecting the Menominees, to which we now turn.

On August 24, 1954, Congress amended 18 U.S.C. § 1162 to strike the Menominee exception, thus making crimes committed by or against members of the tribe on the reservation subject to Wisconsin law. 68 Stat. 250. The amendment was adopted at the behest of the Menominee Tribe, which had "reconsidered its position" with respect to subjection to state law and had requested the removal of the exception from § 1162. House Rep. 2322, 83rd Cong., 2nd Sess. 1 (1954).

The amendment striking the Menominee exception from 18 U.S.C. § 1162 thus became effective some two months after the adoption of the Menominee Termination Act. The provisions of the Termination Act ceding criminal jurisdiction to Wisconsin, which would have accomplished the same result as the Menominee amendment to § 1162, were not to become effective until the transfer of property, which, as noted above, did not take place until April, 1961.

---

shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

. . . . .

Wisconsin————— All Indian country within the State

. . . . .

(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have exclusive jurisdiction.

The next chapter of relevant history, relevant because it sheds some light on the relationship between § 1162 and the Menominee Termination Act, concerns the hunting, trapping, and fishing rights of the Menominees. Public Law 280 contained a provision, which appears in 18 U.S.C. § 1162(b), that nothing in the Act should "deprive any Indian or any Indian tribe . . . of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." After the Menominee Termination Act went into effect, Wisconsin sought to enforce its game laws against the Menominees, who thereupon filed suit in the United States Court of Claims seeking just compensation for the taking, by the Menominee Termination Act, of rights secured to them by the Treaty of Wolf River in 1854, 10 Stat. 1064. The court dismissed the complaint on the ground that the Termination Act had not deprived the Menominees of the hunting, trapping, and fishing rights guaranteed them by the Treaty of Wolf River. *Menominee Tribe v. United States,* 388 F.2d 998, 179 Ct.Cl. 496 (1967). The Supreme Court affirmed in an opinion by Justice Douglas, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), in which he referred to Public Law 280 and the provision just quoted and said,

> Public Law 280 must therefore be considered *in pari materia* with the Termination Act. The two Acts read together mean to us that, although federal supervision of the tribe was to cease and all tribal property was to be transferred to new hands, the hunting and fishing rights granted or preserved by the Wolf River Treaty of 1854 survived the Termination Act of 1954.

*Id.* at 411, 88 S.Ct. at 1710 (footnote omitted).[4]

In December, 1973, Congress repealed the Termination Act by enacting the Menominee Restoration Act, 87 Stat. 770, 25 U.S.C. §§ 903–903f, which petitioner contends restored federal jurisdiction over offenses committed by or against Menominees on the reservation. The 1973 Act provided for resumption of tribal status and the return of tribal assets to federal trusteeship. The provisions pertinent here are paragraphs (b) and (c) of § 3, 25 U.S.C. §§ 903a(b) and (c):

> (b) The Act of June 17, 1954 (68 Stat. 250; 25 U.S.C. §§ 891–902), as amended, is hereby repealed and there are hereby reinstated all rights and privileges of the tribe or its members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to such Act.

> (c) Nothing contained in this Act shall diminish any rights or privileges enjoyed by the tribe or its members now or prior to June 17, 1954, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this Act.

It is this language that determines whether Wisconsin's jurisdiction over crimes committed by or against an Indian on the Menominee Reservation was terminated by the Restoration Act.

In an attempt to invoke the "pursuant to [the Termination] Act" language of paragraph 3(b), petitioner argues that the state's criminal jurisdiction rested on 18 U.S.C. § 1162 only from August 24, 1954, the date of the amendment deleting the Menominee exception from that section, until April 30, 1961, the date the Termination Act became effective, and that thereafter the state's jurisdictional base shifted to the language of § 10 of that Act making "the

---

4. The Court went on to say that its construction was "in accord with the overall legislative plan," noting that the Termination Act provided for the termination of federal "supervision" and that the omission of the word "treaty" from the provision of the Termination Act that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe" was "potent evidence that no *treaty* was in mind." *Id.* at 412, 88 S.Ct. at 1711. (Emphasis in original.) The Termination Act would therefore not be construed "as a backhanded way of abrogating the hunting and fishing rights of these Indians," an intention to abrogate a treaty being one not lightly to be imputed to Congress. *Id.* at 412–413, 88 S.Ct. at 1711.

laws of the several States" applicable to the tribe and its members. Petitioner also refers to the provision in § 10 of the Termination Act which states that, upon the effective date of termination, all federal statutes that affect Indians because of their status as Indians should no longer apply to the Menominees, and asserts that this provision had the effect of making 18 U.S.C. § 1162 inapplicable to the Menominees. Thus, the argument goes, their right not to be subject to state jurisdiction[5] was diminished or lost "pursuant to" the Termination Act, see § 3(b) of that Act; and the latter Act could not cause § 1162 to become effective again as to the Menominees because of § 3(c) of the Act. It is necessarily petitioner's theory that the Menominee amendment to § 1162 either was intended to be temporary only or was anticipatorily repealed by implication by § 10 of the earlier adopted Termination Act.

We cannot accept either theory. Read together, as the Supreme Court's *Menominee Tribe* opinion requires, the three acts passed by the same Congress, § 1162, the Termination Act, and the Menominee amendment to § 1162, indicate that Congress at first intended to postpone subjecting the Menominees to state law until the effective date of the Termination Act but then (at the behest of the Menominees, the legislative history shows) changed its mind and made them immediately subject to state law. There is no reason to believe Congress intended that upon the effective date of the Termination Act Wisconsin's jurisdiction over the Menominees would cease to rest on § 1162, the more generally applicable provision of the federal criminal code, and would thenceforth depend on a statute adopted before the Act making the Menominees subject to § 1162. *Cf. Anderson v. Gladden*, 293 F.2d 463, 466–467 (9th Cir. 1961).[6]

As we read these statutes, the Menominee amendment shifted criminal jurisdiction from the federal government to the state and left nothing upon which the provisions relied on in § 10 of the Termination Act could operate. Accordingly, 18 U.S.C. § 1162 continued to apply to the Menominee Reservation until the date of retrocession unless it was repealed by implication by §§ 3(b) or (c) of the Restoration Act, quoted above.

We do not read these provisions as effecting an implied repeal. Section 3(b) specifies, as the rights that are being reinstated, those rights "which may have been diminished or lost pursuant to" the Termination Act. The right to be free of state criminal jurisdiction could in no sense be said to have been diminished or lost pursuant to that Act, however. It was, by the terms of that Act, to continue in existence until the Act became effective, which did not occur until April 30, 1961. The right was lost long before that date pursuant, not to the Termination Act, but to the amendment removing the Menominee exception from 18 U.S.C. § 1162. Inasmuch as the right was, as it turned out, unaffected by the Termination Act, it cannot be said that it "may have been diminished or lost pursuant to" that Act.

Nor does § 3(c), quoted above, achieve a repeal of § 1162 by implication. That para-

5. The right of Indians to be free from state regulation of their conduct in Indian country unless Congress provides otherwise derives from the Indian sovereignty doctrine enunciated in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). See Cohen, *Indian Rights and the Federal Courts,* 24 Minn.L.Rev. 145, 153–154 (1940). As a result of the holding in *Ex Parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), that they were not subject to federal law either, and therefore a murder by an Indian of another Indian on the reservation was not punishable under either state or federal law, Congress enacted the predecessors of present 18 U.S.C. §§ 1152 and 1153. See Cohen, *supra,* at 152.

6. We would be unwilling to attribute to Congress an intention so pointless and therefore so unlikely even if we were convinced, which we are not, that §§ 1162(a) and (c), which themselves render inapplicable the federal criminal statutes affecting Indians because of their status as Indians and make Indians subject to the same laws as all other persons, could appropriately be described for purposes of the Termination Act as statutes affecting Indians because of their status as Indians.

graph purports only to limit the effect of the provisions of the Restoration Act itself and does not address the effect of any other act or purport to restore rights previously lost. The subject of restoration of rights is taken care of in § 3(b), which we have already discussed.

We find nothing in the legislative history to suggest that Congress meant something other than what it said in §§ 3(b) and (c). Nowhere is the allocation of criminal jurisdiction between the state and federal government discussed. The statement in the Senate Report that §§ 3(b) and (c) operate to "reinstate the tribe to all rights and privileges which were lost" by the Termination Act, and to provide "for protection of existing rights and obligations" is but a loose paraphrase of the statutory language. Sen.Rep.No.93–604, 93rd Cong., 1st Sess. 6 (1973). Nor can an intent to amend 18 U.S.C. § 1162 by implication be inferred from general statements in the Senate Report, such as the statements that the purposes of the Act are to "make available to the tribe the Federal services lost through termination, and provide for the reestablishment of tribal self-government," id. at 1, and that § 3(b) of the Act "effectively restores the tribe to the legal status it occupied prior to the Termination Act," id. at 6.

That Congress did not believe there was necessarily a relationship between termination or restoration and state criminal jurisdiction or 18 U.S.C. § 1162 appears not only from another restoration act, the Siletz Indian Tribe Restoration Act, 91 Stat. 1415 (1977), which expressly continued state criminal jurisdiction over the tribe, 25 U.S. C.A. § 711e(c)(3) (1978 Supp.), but also from the fact that most tribes that were subjected to state criminal jurisdiction by virtue of § 1162 were never terminated. Also, five of the tribes in addition to the Menominees that were terminated in the 1950's occupied reservations in states that did not otherwise have criminal jurisdiction under § 1162.[7] Finally, although Congress abandoned its

termination policy as a mistake and "attempted to correct this error and restore Federal recognition to terminated tribes," House Rep. 95–623, 95th Cong., 1st Sess. 2 (1977), it did not see fit to repeal § 1162 in its totality; rather, it gave the "§ 1162 states" the option to retrocede jurisdiction to the federal government, 25 U.S.C. § 1323, 82 Stat. 79 (1968), an option Wisconsin ultimately exercised with respect to the Menominees, as we have noted above. In the light of this history, we cannot conclude that when Congress decided to restore the Menominees' tribal status it must also have decided to terminate state jurisdiction over crimes by or against an Indian committed on the reservation.

We think it unlikely that Congress would have left so important a matter as the allocation of criminal jurisdiction to be determined by an inference contravened by the explicit language of 18 U.S.C. § 1162, would have made no provision for an orderly transfer of criminal jurisdiction, and would have intended that 25 U.S.C. § 1323, which does provide for an orderly transfer, be inapplicable. Yet all this would have to be imputed to Congress if petitioner's argument were accepted.

The uncertainty that would have stemmed from leaving repeal of § 1162 to implication prior to retrocession would have extended to attempts by the federal government to prosecute for crimes committed by or against Indians on the reservation. If a federal indictment had charged petitioner with burglary and murder committed on the reservation, it is at least questionable that a court would have sustained the indictment, given the explicit language of § 1162, the statute allowing retrocession of the jurisdiction by Wisconsin and that state's inaction as of that time, the doctrine of strict interpretation and fair warning applicable to criminal statutes, and the usual intendments against repeal by implication. The result of Congress' at-

---

7. The Alabama and Coushatta Indians of Texas (25 U.S.C. §§ 721–728); the Paiute Indians of Utah (25 U.S.C. §§ 741–760); the Wyandotte Tribe of Oklahoma (25 U.S.C. §§ 791–807); the Peoria Tribe of Oklahoma (25 U.S.C. §§ 821–826); and the Ottawa Tribe of Oklahoma (25 U.S.C. §§ 841–852).

tempting a repeal by implication might very well have been to return the Menominee Reservation to the condition that existed after *Ex Parte Crow Dog, see* note 5, *supra,* with neither state nor federal government having criminal jurisdiction.

Congress recognized the importance of certainty in the allocation of jurisdiction in 25 U.S.C. § 1323, where it expressly authorized the United States "to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by [a] State pursuant to the provisions of," *inter alia,* 18 U.S.C. § 1162. Following the adoption of this provision, the President issued an executive order designating and empowering the Secretary of the Interior to exercise the authority granted by § 1323 but requiring prior consultation with the Attorney General and publication of appropriate notice of the retrocession and its effective date in the Federal Register. Exec. Order No. 11,435, 33 Fed. Reg. 17,339 (1968). Retrocession of jurisdiction was thus recognized by Congress and the Executive to be an event important enough to require specific authorization and implementation by formal procedures.

In the Menominee Restoration Act itself, 25 U.S.C.A. § 903d(d) (1978 Supp.), Congress sought "to assure that the provision of necessary governmental services is not impaired as a result of the transfer of assets . . .." Whether or not the Bureau of Indian Affairs' interpretation of this language as covering criminal jurisdiction, *State ex rel. Pyatskowit v. Montour, supra,* 72 Wis.2d at 280–281, 240 N.W.2d at 187–188, is correct, at least the provision is another instance in which Congress has exhibited an awareness of the importance of an orderly transfer of governmental functions generally, an awareness that is hardly compatible with a repeal by implication that would leave doubts as to whether the state or federal government, or either, was to exercise criminal jurisdiction.

We conclude that 18 U.S.C. § 1162 continued to give the State of Wisconsin jurisdiction over crimes committed by or against Indians on the Menominee Reservation until Wisconsin retroceded that jurisdiction to the United States pursuant to 25 U.S.C. § 1323. Wisconsin had jurisdiction to prosecute petitioner. We therefore affirm the denial of the writ of habeas corpus.

AFFIRMED.