James Quentin ANDERSON, Appellant,

v.

C. T. GLADDEN, Warden, Oregon State
Penitentiary, Appellee.

No. 17188.

United States Court of Appeals
Ninth Circuit.

July 7, 1961.

**464**

James Quentin Anderson, in pro. per.

Louise Jayne, Portland, Ore., for appellant.

Robert Y. Thornton, Atty. Gen., Harold W. Adams, Asst. Atty. Gen. of Oregon, for appellee.

C. E. Luckey, U. S. Atty., Portland, Ore., for United States.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

James Quentin Anderson, serving a life term in Oregon State Penitentiary for second degree murder, appeals from a district court order denying his application for a writ of habeas corpus. The opinion and order of the district court are reported in Anderson v. Gladden, 188 F.Supp. 666.[1]

The homicide was committed November 5, 1954, on the Klamath Indian Reservation in Klamath County, Oregon. Anderson is of Indian blood and at all times here in question was an enrolled member of the Klamath Tribe of Indians residing on that reservation. He seeks discharge from state custody on the ground that by reason of his race, his tribal membership, the place of the homicide, and the provisions of federal and state law then existing, the courts of Oregon lacked jurisdiction to try him for the crime of which he was convicted.

From February 14, 1859, when Oregon was admitted as a state, until August 15, 1953, Oregon did not claim or attempt to exercise jurisdiction to prosecute an Indian for a murder committed on an Oregon Indian reservation. During all that time the state acknowledged the exclusive jurisdiction of the federal courts in this field.

■ That exclusive jurisdiction had been conferred on the federal courts by laws of Congress since 1885. The statutory provisions are currently contained in 18 U.S.C.A. § 1153.[2] It is therein provided that any Indian who commits any one of ten enumerated crimes, including murder, within Indian country "shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." See In re Carmen, D.C.N.D.Cal., 165 F.Supp. 942, 948, affirmed mem. sub nom., Dickson v. Carmen, 9 Cir., 270 F.2d 809. "Indian country" as used in this statute includes the Klamath Reservation. See 18 U.S.C.A. § 1151.

Oregon, however, asserts and the United States concedes[3] that all federal jurisdiction to prosecute an Indian for such crimes terminated and exclusive state jurisdiction attached on August 15, 1953, with the enactment of Public Law 280. 67 Stat. 588. Section 2 of that act added section 1162 to Title 18 of the United States Code, 18 U.S.C.A. § 1162. Subsection (a) of that new section conferred jurisdiction on five states, including Oregon, over offenses committed by or against Indians on Indian reserva-

---

1. Anderson's conviction in the Circuit Court of the State of Oregon for Harney County was affirmed by the Supreme Court of Oregon. State v. Anderson, 207 Or. 675, 298 P.2d 195, 60 A.L.R.2d 850. That court subsequently affirmed an order of the Circuit Court of the State of Oregon for Klamath County denying Anderson's application for a writ of habeas corpus. Anderson v. Britton, 212 Or. 1, 318 P.2d 291.

2. Section 1153 is generally known as the Ten Major Crimes Act. There has been no amendment of this statute since 1949, but in 1956 embezzlement or theft from an Indian tribal organization was made a separate offense, and now reference is sometimes made to the Eleven Major Crimes Act. 18 U.S.C.A. § 1163.

3. The United States is an intervener in these proceedings.

tions within the state. Oregon's jurisdiction was to extend over all Indian country in that state except the Warm Springs Reservation. It was then provided in subsection (c) of section 1162 that section 1153, under which federal jurisdiction over such prosecutions had theretofore been asserted, should not be applicable within the areas of Indian country listed in subsection (a). These subsections of section 1162 as originally enacted are quoted in the margin.[4]

Since the homicide here in question was committed after the enactment of Public Law 280, Oregon assumed jurisdiction to prosecute Anderson for that offense. He was indicted under ORS 163.010, which pertains to first degree murder, and convicted under ORS 163.-020, which pertains to second degree murder, both of which statutes have been in effect for many years.

On this appeal it is contended for appellant that under a treaty between the United States and the Klamath Indian Tribe, Anderson acquired the right to be prosecuted in the federal courts for the offense in question, which right was not abrogated by the enactment of Public Law 280.

On February 17, 1870, the United States entered into a treaty with Klamath and Modoc Tribes and the Yahooskin Band of the Snake Indians. 16 Stat. 707. In article IX of that treaty the tribes which were parties thereto agreed that they would submit to and obey all laws and regulations which the United States might prescribe for their government and conduct. Appellant argues that by reason of this and other provisions of the treaty, the United States undertook to exercise police power over the Klamath Indian Tribe, precluding any such assertion of power by the state of Oregon.

In his briefs filed in this court appellant, then appearing in propria persona, contended that federal jurisdiction so established could not constitutionally be transferred to Oregon until appropriate steps were taken to terminate the status of the Klamath Indian tribal unit as a quasi-sovereign entity with its own territorial jurisdiction.[5] In the argument before this court, however, appellant was represented by counsel who did not press this contention. Counsel in fact conceded that rights of this kind secured by Indian treaty may be abrogated by unilat-

---

4. "§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country.

"(a) Each of the States * * * listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State * * * to the same extent that such State * * * has jurisdiction over offenses committed elsewhere within the State * * *, and the criminal laws of such State * * * shall have the same force and effect within such Indian country as they have elsewhere within the State * * *:

| State * * * of | Indian Country affected * * * |
|---|---|
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, [except the Menominee Reservation] |

* * * * *

"(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section." (§ 1162 was amended in 1954. See note 7, infra.)

5. In his in propria persona presentation Anderson did not renew the contention made in the state habeas corpus proceeding and rejected by the Supreme Court of Oregon in Anderson v. Britton, supra, n. 1, that apart from the Treaty of February 17, 1870, jurisdiction over offenses committed by Indians in Indian country was exclusively and inherently federal and could not constitutionally be delegated to a state.

eral action of the United States Congress, without first dissolving the tribal entity.

▆▆▆ Counsel was well advised in making this concession. The plenary power of Congress over Indian tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by later statute. Nicodemus v. Washington Water Power Co., 9 Cir., 264 F.2d 614, 617. No principle of the Constitution requires that a tribe which has enjoyed benefits under a treaty with the United States be first disbanded before such benefits may be wholly or partially withdrawn.

But counsel for appellant argues that while Indian treaties are subject to amendment or repeal by unilateral action of the United States, Public Law 280 was not intended to terminate the substantive rights acquired by the Klamath Indians under the Treaty of 1870. It is urged that the abrogation of such substantial rights acquired by Indian treaty as the right to be tried in federal court cannot be presumed or implied, but must be evidenced by clear and explicit statutory language. Such language, it is contended, is not to be found in Public Law 280.

▆▆▆ For present purposes we will assume, as appellant urges, that the treaty with the Klamath Indian Tribe constituted an undertaking by the United States to exercise exclusive police power over that tribe. The rights thus claimed thereunder are substantial.[6] An intention to alter or abrogate a substantial right created by Indian treaty is not to be lightly attributed to Congress. See United States v. Payne, 264 U.S. 446, 448, 44 S.Ct. 352, 68 L.Ed. 782.

▆▆ In unambiguous terms, Public Law 280 withdrew federal jurisdiction over offenses committed in specified areas of Indian country by the grant of exclusive criminal jurisdiction therein to five designated states. Oregon is one of them, and "all Indian country within the state, except the Warm Springs Reservation" is placed under the state's jurisdiction.[7]

In our view, this unambiguous statutory language is not obscured because Congress in the following year enacted legislation which provided comprehensive procedures for the termination of federal supervision over the property of the Klamath Indian Tribe and its members and for the termination of federal services furnished such Indians because of their status as Indians. Act of August 13, 1954, 68 Stat. 718, 25 U.S.C.A. §§ 564–564w-1.

The 1954 enactment dealt with the relationship between the Klamath Indian Tribe and its members and the United States as the relationship then existed. But by then, pursuant to Public Law 280, any treaty right these Indians may have had to be tried in federal court had already been terminated. The relationship which still existed, however, required the continuation of certain other federal services and precluded the immediate application of the general civil law

6. It has been held that the right to be tried in a federal court accorded an Indian by the Ten Major Crimes Act (section 1153) is not a mere procedural right and is so substantial that it may not be waived even by *express agreement*. In re Carmen, 165 F.Supp. at page 950. The right to be so tried accorded not only by general statute but also by Indian treaty could not be less substantial.

7. Examination of the legislative history of Public Law 280 indicates that the Warm Springs Reservation in Oregon and specified reservations in Minnesota (Red Lake) and Wisconsin (Menominee) were not excepted from its provisions because of any supposed legal impediment arising from an Indian treaty or any other circumstance. They were excepted because the Warm Springs, Red Lake and Menominee Tribes advised the Indian Bureau that they preferred to continue under the pre-existing arrangement. 2 U.S.Code Cong. and Adm.News 1953, pp. 2412, 2413. When the Menominee Indian Tribe in Wisconsin later changed its position and welcomed a transfer of criminal jurisdiction to the state of Wisconsin, an act was passed accomplishing this change without affecting the tribe's status as a quasi-sovereign entity. Act of Aug. 24, 1954, 68 Stat. 795. See the legislative history of this act, 2 U.S.Code Cong. & Adm.News 1954, p. 3171.

of Oregon. These services are to be terminated and these state laws are to be made applicable when the provisions of the Klamath Indian tribe termination act have been fully carried out.

■ It is further argued that Congress did not intend federal jurisdiction to expire with respect to criminal offenses committed in Oregon Indian country until Oregon by affirmative legislative action bound itself to assume such jurisdiction. No such legislation has been enacted in Oregon since Public Law 280 was passed.

The state legislation which, according to appellant, Congress required before federal jurisdiction would be released is the kind of legislation referred to in section 7 of Public Law 280, quoted in the margin.[8] But that section operates with respect to "any other State" not having jurisdiction as provided in the act. The statutory language refers to states other than Oregon and the four other states, upon which five states the act operates, under the language of section 2(a), to confer jurisdiction as of the date of enactment, excepting specified areas within three of those states as noted.[9]

But it is further argued that even if Congress did not intend to subject Oregon to the requirements of section 7 of Public Law 280, it should have done so because no legislation then existed in Oregon whereby that state obligated and bound itself to assume the criminal jurisdiction the United States desired to release. This in effect is an argument not that Public Law 280 has been misconstrued by the courts of Oregon and by the district court, but that it is invalid because it leaves an hiatus in so far as criminal jurisdiction over the Indian country of Oregon is concerned.

In pressing this argument appellant urges that prior to the time Oregon became a territory, it did not purport to have or attempt to exercise criminal jurisdiction over offenses committed by Indians.[10] Hence, it is asserted, Oregon may not now exercise such jurisdiction without first enacting affirmative legislation of the kind contemplated by section 7 of Public Law 280.

■ Whether the courts of Oregon, upon the relinquishment of federal jurisdiction in this field, had jurisdiction under then existing state law to try Indians for such offenses is a state question. The courts of Oregon have decided that question, having held in Anderson v. Britton, 212 Or. 1, 15–20, 318 P.2d 291, 297–298, that no implementing state legislation was needed.[11] That determina-

8. "Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

9. The intent of Congress respecting section 2(a) and the purpose of section 7 were stated in House Report 848, 83 Cong., 1st Sess.1953. That latter purpose was said to be to give the consent of the United States to states then having laws expressly disclaiming jurisdiction to acquire jurisdiction by amending or repealing such disclaimer laws. V.2, 1953 U.S. Code Cong. & Adm.News, pp. 2409, 2412, 2413.

10. This same contention was advanced in the state habeas corpus proceeding but

in support of the proposition that the power to define and punish crimes committed by Indians on Oregon Indian reservations is exclusively and inherently federal and cannot constitutionally be delegated to Oregon. That proposition, which was rejected by the Supreme Court of Oregon, has not been renewed on this appeal.

11. In reaching this conclusion the Oregon Supreme Court relied upon ORS 131.210, adopted in 1864, which provides:
"Every person, whether an inhabitant of this state or any other state, territory or country, is liable to punishment by the laws of this state for a crime committed by him in this state, except where such crime is by law cognizable exclusively in the courts of the United States."
With the passage of Public Law 280, murder by an Indian within the designated Indian country within the state was no longer "cognizable exclusively in the courts of the United States."

tion is binding upon us. 28 U.S.C.A. § 1652; Trust Co. of Chicago v. Pennsylvania R. R., 7 Cir., 183 F.2d 640, 642–643, 21 A.L.R.2d 238; Manning v. Ketcham, 6 Cir., 58 F.2d 948, 949.

We further agree with the state court's holding on the question of the power of Congress to relinquish this jurisdiction in favor of the states. The power over Indians was deemed not so inherently or exclusively federal as to apply beyond the extent to which the federal government has preempted the field, and the federal government could thus withdraw from the field and turn the subject matter back to the states when it chose to do so.

In appellant's in propria persona briefs, some of the basic contentions discussed above are developed along somewhat different lines, and additional arguments are advanced which were not presented in the oral argument. These variant and additional arguments have been examined and in our opinion are without merit.

Affirmed.