759 P.2d 937
STATE of Idaho, Plaintiff-Respondent,

v.

Adeline R. FANNING,
Defendant-Appellant.

No. 17073.

Court of Appeals of Idaho.

July 28, 1988.

Adeline R. Fanning, pro se.

Jim Jones, Atty. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for respondent.

WALTERS, Chief Judge.

A jury found Adeline Fanning guilty of violating I.C. § 18–8004 by driving a motor vehicle while under the influence of alcohol. A magistrate sentenced her to ten days in jail, with eight days suspended, and imposed a fine of $160. On appeal to the district court, the judgment, including the sentence, was affirmed. Fanning appeals from the district court's determination. She contends that the State of Idaho had no jurisdiction to prosecute her because she is a Coeur d'Alene Indian. She also asserts that she was denied a right to counsel of her choice in the courts below. For the reasons hereinafter set forth, we affirm the district court's appellate decision upholding the magistrate's judgment and the sentence.

Fanning was arrested for driving while under the influence at the intersection of State Highway 5 and U.S. Highway 95 in Plummer, Idaho. Although the record is inconclusive we will assume for purposes of this appeal that the intersection in question is within "Indian country"[1] and that Fanning is an enrolled member of the Coeur d'Alene tribe. Prior to her trial Fanning requested that she be permitted the

1. Subject to certain exceptions inapplicable to the instant case, "Indian country" is defined as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151.

assistance of lay counsel, namely her husband. The request was denied. Thereafter, Fanning essentially stood mute and offered no evidence or argument in her defense.

## I

We turn first to her challenge to the court's jurisdiction. In 1963, in accordance with section 7 of the Congressional Act of August 15, 1953, Public Law 280, the State of Idaho assumed jurisdiction for certain civil and criminal law-related matters arising in Indian country. One of the enumerated areas over which the state assumed jurisdiction is in the "[o]peration and management of motor vehicles upon highways and roads maintained by the county or state, or political subdivisions thereof." I.C. § 67–5101(G).

The history and purpose of Public Law 280 were succinctly described by Justice Stewart in *Washington v. Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979):

Public Law 280 ... was enacted by Congress in 1953 in part to deal with the "problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Bryan v. Itasca County*, 426 U.S. 373, 379 [96 S.Ct. 2102, 2106, 48 L.Ed.2d 710]; H.R.Rep. No. 848, 83d Cong., 1st Sess., 5–6 (1953). The basic terms of Pub.L. 280, which was the first federal jurisdictional statute of general applicability to Indian reservation lands, are well known. To five States it effected an immediate cession of criminal and civil jurisdiction over Indian country, with an express exception for the reservations of three tribes. Pub.L. 280, §§ 2 and 4. To the remaining States it gave an option to assume jurisdiction over criminal offenses and civil causes of action in Indian country without consulting

with or securing the consent of the tribes that would be affected. States whose constitutions or statutes contained organic law disclaimers of jurisdiction over Indian country were dealt with in § 6. The people of those States were given permission to amend "where necessary" their state constitutions or existing statutes to remove any legal impediment to the assumption of jurisdiction under the Act. All others were covered in § 7. *Id.* at 471–474, 99 S.Ct. at 747–48 (footnotes omitted).[2]

To support its assertion that the magistrate's division had jurisdiction over the DUI charge against Fanning, the state relies upon the Idaho Supreme Court's pronouncement in *State v. Michael*, 111 Idaho 930, 729 P.2d 405 (1986). There, the Court held that I.C. § 67–5101, whereby the State of Idaho assumed the jurisdiction offered by section 7, encompasses the crime of driving while under the influence of intoxicants. However, Fanning's attack on the state court's jurisdiction is leveled not at Idaho's assumption of jurisdiction, but rather is directed at Congress's power to pass that enforcement authority to the states.

Public Law 280 rarely has been the subject of constitutional challenges in state or federal courts. Although having had occasion to apply the act, the United States Supreme Court has not seen fit to rule directly upon its constitutional foundation. *E.g.*, *Washington v. Yakima Indian Nation, supra.* However, the few lower courts which have examined the act have been unanimous in finding a valid conferral of jurisdiction by Congress. *See, e.g., Robinson v. Wolff*, 349 F.Supp. 514 (D.E.Neb.), *aff'd* 468 F.2d 438 (8th Cir.1972); *Anderson v. Gladden*, 188 F.Supp. 666 (D.Or.1960), *aff'd* 293 F.2d 463 (9th Cir.), *cert. denied*, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961); *Robinson v. Sigler*, 187 N.W.2d 756 (Neb.1971), *appeal dis-*

---

**2.** Section 7 provided:

The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legis-

lative action, obligate and bind the State to assumption thereof.

This section was repealed by § 403(b) of Pub.L. 40–284, Title IV, April 11, 1968, 82 Stat. 79. But the repeal did not affect any cession of jurisdiction made pursuant to section 7 prior to its repeal. *See* 18 U.S.C.A. § 1162 (historical note).

*missed,* 404 U.S. 987, 92 S.Ct. 543, 30 L.Ed. 2d 549 (1971); *Anderson v. Britton,* 212 Or. 1, 318 P.2d 291 (1957), *cert. denied,* 356 U.S. 962, 78 S.Ct. 999, 2 L.Ed.2d 1068 (1958). Nonetheless, Fanning asserts that, as applied here, any delegation by Congress was unlawful because Congress could only have been acting pursuant to the Commerce Clause of the United States Constitution, and she was not engaging in an act of commerce. Fanning submits there is no other basis for Congress's power to enact this provision, either in Art. 1, § 8, of the United States Constitution or elsewhere.

On first blush, Fanning's argument has merit. There is no facially apparent provision of the United States Constitution empowering Congress to delegate criminal jurisdiction over Indians to the states. However, upon closer examination Fanning's theory of Congressional power with respect to Indians is revealed to be erroneously narrow. The United States Supreme Court has recognized Congress's authority to manage Indian affairs not only pursuant to the Commerce Clause, *e.g., McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), but also pursuant to the Treaty Clause (art. II, § 2, cl. 2), *e.g., Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Board of County Commissioners v. Seber,* 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943), and a variety of other provisions. *See generally* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW Ch. 3 (1982 ed.) (hereinafter CO-HEN).

The federal-tribal relationship is premised upon broad, albeit not unlimited, federal constitutional power over Indian affairs. The power often is often described as "plenary." COHEN at 207. "[T]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence.... [T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831). As described by Cohen:

Court opinions most often refer to the Indian Commerce Clause, the Treaty Clause, and the Supremacy Clause in discussing the source of federal power over Indian affairs. While those provisions are most directly relevant, it is somewhat artificial to analyze the constitutional provisions separately. For most purposes it is sufficient to conclude that there is a single "power over Indian affairs," an amalgam of the several specific constitutional provisions.

COHEN at 211 (footnote omitted).

■ In light of the complex relationship between the federal government and the tribes, we are not prepared to adopt the simplistic constitutional interpretation advocated by Fanning. With respect to the limitations on this "plenary" power, CO-HEN summarizes:

[A]lthough the Supreme Court in *United States v. Kagama* suggested that congressional power over Indians may be implied from necessity, that concept has been supplanted by the analysis that Indian statutes are subject to constitutional restrictions and must be tied rationally to the trust obligations of Congress. The teaching of modern cases is that acts of Congress affecting Indians are subject to judicial review, and that although congressional power is broad, ordinary constitutional protections may be invoked by Indians in their relationship with the federal government. Thus, while the courts refer on occasion to the "plenary power" of Congress over Indians, the term is not synonymous with "absolute" or "total." Rather, the phrase appears to be used as a summary of the congressional powers over Indians. The power over Indian affairs is unusual in our federal system because it includes general federal authority to legislate over health, safety, and morals. Examples of the rare instances in which Congress exercises similar powers include the administration and government of territories and possessions, the District of Columbia, and federal enclaves. Consequently, although in practice Congress leaves much governing authority to the tribes, federal power over Indians is "plenary" in the sense that in Indian matters Congress

can exercise broad police power, rather than only the powers of a limited government with specifically enumerated powers.

COHEN at 219–220 (footnotes omitted). Plenary does not mean absolute, but Fanning has not called to our attention, nor have we discovered, any theory of constitutional or federal law which would deny Congress the power to regulate the operation of motor vehicles by Indians while in Indian country—or to pass such regulatory power to the states.[3]

Whether the state, upon enactment of P.L. 280, took proper steps to establish its own jurisdiction in this field is a state law question. *Anderson v. Gladden, supra,* 293 F.2d at 463. The Idaho Supreme Court has answered that question in the affirmative. *See State v. Michael, supra.* Therefore, we hold that the magistrate properly exercised jurisdiction over this case.

## II

Next we examine Fanning's assertion that she was denied her constitutional right to the assistance of counsel at trial. Prior to trial, Fanning repeatedly rejected the court's offer to appoint a licensed attorney on her behalf. Instead, she sought the court's permission to be assisted by her husband, as lay counsel.

In *State v. Harrold,* 113 Idaho 938, 750 P.2d 959 (Ct.App.1988), we acknowledged our Supreme Court's holding that a defendant in a criminal prosecution has no constitutional right to be represented at trial by lay counsel. *See State v. Brake,* 110 Idaho 300, 715 P.2d 970 (1986). Fanning attempts to draw a distinction between "representation" and the "assistance" of coun-

sel. She concedes that she had no constitutional right to "representation" by lay counsel, but asserts a right to the "assistance" or counseling from a layman during the proceeding. The state argues that this is a "distinction without a difference."

Our review of the record of the proceedings before the magistrate leads us to conclude that Fanning sought more than a mere "advisor." At a pretrial hearing, Fanning explained her reasons for seeking counsel:

> I am not capable of arguing the issues in Court myself. I need counsel to argue these issues. I need counsel to argue this Petition for Counsel, as I have stated that I am not capable of arguing the issues. I have demanded counsel of my choice, and that choice is my husband.... I'm not asking the Court to allow anyone to represent me in this case, but the counsel of my choice to assist me and speak for me as I am not capable for myself in Court.

The magistrate took judicial notice of the fact that Fanning's husband was not an attorney licensed in the State of Idaho and, pursuant to *Brake,* denied her "Petition and demand for Counsel of choice." Fanning declined to participate further in the proceedings. At trial she responded simply "yes" or "no" to the court's inquiries and declined every offer to argue or to present a case on her own behalf.

We are not persuaded that a genuine distinction exists between the type of assistance requested here and that found not to be constitutionally guaranteed in *Brake.* BLACK'S LAW DICTIONARY defines "to represent a person" as "to stand in his place; to speak or act with authority

---

**3.** We note that our answer to this question is the same as that given by the Ninth Circuit in *Anderson v. Gladden, supra,* 293 F.2d at 446. However, the Ninth Circuit upheld the exercise of state jurisdiction under P.L. 280 upon a theory that states possess inherent jurisdiction which lies dormant while federal jurisdiction exists but awakens when federal jurisdiction is withdrawn. A similar view has been expressed by the Oregon Supreme Court:

> The real question involves consideration of the fundamental nature of the federal power over Indian affairs. If that power is inherent solely in the federal government, to the necessary exclusion of the state, then the question

of delegation may become important. But if the state has residual power over Indians and Indian territory, which is merely in suspension so long as the federal government chooses to occupy the field, then a withdrawal by the federal government does not vest any new power in the state but merely removes an impediment to the exercise of pre-existing power.

*Anderson v. Britton,* 212 Or. 1, 318 P.2d 291, 298 (1957). We need not decide whether these theories are legally and historically sound. It is sufficient to note that the result—upholding a state's jurisdiction under P.L. 280—is the same as we reach today.

on behalf of such person; to supply his place; to act as his substitute or agent." *Id.* at 1169 (5th ed. 1979). Fanning requested that her husband be permitted to speak for her. That act is one of the essential characteristics that defines the in-court services of an attorney. Accordingly, we hold that the magistrate did not err by denying her petition for lay counsel of choice. Our holding is limited to the facts presented by this record. We do not decide today whether more limited assistance or support from lay parties may be permitted or mandated under other circumstances.[4]

The decision of the district court, upholding the magistrate's judgment of conviction, is affirmed.

BURNETT and SWANSTROM, JJ., concur.

---

4. For example, we acknowledge that, under special circumstances, other types of assistants commonly join a defendant at the party's table, including interpreters for the deaf and for non-English speakers, and aides for incompetent or minor persons. With respect to parental assistance for minors, *see State v. Ritchie,* 114 Idaho 528, 757 P.2d 1247 (Ct.App.1988).